E-FILED
Friday, 29 July, 2011 05:27:09 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | |
|---|---|
| **UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | |
| **Plaintiff,** | **Civil Action No. 07 C 1154** |
| **v.** | **Magistrate Judge Gorman** |
| **AUTOZONE, INC.** | |
| **Defendant.** | |

**PLAINTIFF EEOC'S MEMORANDUM IN OPPOSITION TO AUTOZONE'S MOTION FOR JUDGMENT AS A MATTER OF LAW, FOR NEW TRIAL, OR IN THE ALTERNATIVE, TO ALTER OR AMEND JUDGMENT**

The jury's verdict in this action is amply supported by the record, and Autozone has offered no basis for granting judgment as a matter of law, granting a new trial, or otherwise disturbing the jury's verdict, other than to apply the statutory maximum for damages.

Autozone also offers no legal or factual argument for denying backpay. Under Seventh Circuit decisional law, there is a strong presumption that backpay is available to victims of employment discrimination. As Autozone notes, the parties agreed upon the amount of backpay ($115,000). Another stipulation, contained in the Pre-Trial Order, establishes that Autozone's violation of the law caused Shepherd's loss of wages. In any event, evidence of causation was presented at trial and was not disputed. Therefore, it was entirely appropriate to include an award of backpay in the judgment, and Autozone has presented no reason to amend the judgment to omit this presumptively available form of relief.

Autozone's suggestion that the Court order the EEOC to choose between remittitur of 97% of the jury's verdict or a new trial is entirely unwarranted. With respect to compensatory

damages, the evidence demonstrated that John Shepherd experienced a great deal of physical pain and other suffering over a period of many months in 2003. This included severe pain on an almost daily basis, caused by work he was unlawfully compelled to perform. On two occasions in 2003, this resulted in injuries that were serious enough to necessitate leaves of absence. The September 2003 injury required several months of rehabilitation and rendered Shepherd unable to work for an extended period of time. The EEOC also presented medical evidence that Shepherd experienced severe emotional distress. These facts easily support the jury's award of $100,000 for pain and suffering. EEOC is confident that another trial would yield a similar result.

The EEOC does not object to amendment of the judgment to reduce the punitive damages award from $500,000 to $200,000, so that the total damages award ($300,000 in compensatory and punitive damages) comports with the applicable statutory limit. However, Autozone has provided no basis for any further reduction of punitive damages through remittitur. Especially after it is reduced by 60% to conform to the statutory cap, the jury's assessment of punitive damages is not excessive, either in light of the evidence in this case or when compared to comparable cases. It is Autozone's burden to prove otherwise, and it has not done so.

Accordingly, the judgment should be amended to reduce punitive damages from $500,000 to $200,000, but the EEOC respectfully requests that Autozone's motion be denied in all other respects.

## ARGUMENT

### A. Judgment As A Matter Of Law Is Not Warranted

"Once a jury has spoken, we are obliged to construe the facts in favor of the parties who prevailed under the verdict." Tart v. Illinois Power Co., 366 F.3d 461, 464 (7th Cir. 2004).

> When entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, the court must draw all inferences in favor of the nonmoving party.... We may not make credibility determinations or reweigh the evidence; we must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses. We are particularly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of the jury. This is because employment discrimination cases often involve sensitive and difficult issues of fact, and plaintiffs often have only circumstantial evidence on which to rely.

Id. at 472 (internal citations and quotation marks omitted), citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000).

"When reviewing a jury verdict, we are not allowed to reweigh the evidence or substitute our own credibility determinations for that of the jury because [q]uestions of credibility and weight of the evidence [are] within the purview of the jury, whose verdict cannot be lightly set aside so long as it has a reasonable basis in the record." Gower v. Vercler, 377 F.3d 661, 666 (7th Cir. 2004) (quotation marks omitted).

In short, a party seeking to set aside a jury verdict as a matter of law "bears a heavy burden in making such a claim," as the court is "obliged to leave the judgment undisturbed unless the moving party can show that no rational jury could have brought in a verdict against [him]." Maher v. City of Chicago, 547 F.3d 817, 824 (7th Cir. 2008) (alteration in original); see also EEOC v. G-K-G, Inc., 39 F.3d 740, 745 (7th Cir.1994).

In the case at bar, Autozone contends that it is entitled to judgment as a matter of law with respect to two elements of liability: (i) that Shepherd was qualified for his job; and (ii) that

Autozone failed to provide him a reasonable accommodation.[1] Autozone also contends: (iii) that it is entitled to judgment as a matter of law with respect to punitive damages.

The evidence provides a reasonable basis for the jury's verdict with respect to each of these matters.

**i) The EEOC Presented Evidence That Shepherd Was Qualified**

The ADA defines a qualified individual as one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Copious evidence was presented to the jury that during the relevant time period, Shepherd was well qualified for his job. Where there is some evidence that the defendant itself has evaluated and an individual's qualifications and found them sufficient, this is enough to establish a dispute of fact as to an employee's qualifications for a position. See Germano v. International Profit Ass'n, Inc., 544 F.3d 798, 806 (7th Cir. 2008). At trial, evidence was presented that Autozone hired Shepherd and promoted him to the position of Parts Sales Manager ("PSM"). Tr. 128-30, 368.[2] Over the course of his four years as a PSM, Shepherd received a variety of awards for excellent customer service, safety, preventing shoplifting, and the like. Tr. 182-89; see also P. Exh. 16, 17, 27-29 (awards and nominations).[3] As late as August 2003, just before the end of Shepherd's employment, Autozone relied on Shepherd to train other employees. Tr. 190-91.

Other evidence was introduced that Shepherd was a very capable employee. As Autozone itself stipulated, "Parts Sales Manager was a sales and customer service position" Tr.

---

[1] Autozone does not contend that it is entitled to judgment as a matter of law with respect to the other elements of liability that were put to the jury: (1) whether Shepherd was disabled; and (2) whether Autozone was aware of Shepherd's disability and of his need for an accommodation.
[2] "Tr." refers to the transcript of the June 1-3, 2011 trial, Doc. Nos. 229-32.
[3] "P. Exh." and "D. Exh." refer to the plaintiff's and defendant's trial exhibits, respectively.

431; see also Doc. No. 227, No. 7. Shepherd testified that 80% of the job of a PSM was sales and customer service work. Tr. 131. Shepherd's proficiency at sales work was evidenced by sales statistics that were admitted into evidence. The statistics showed that Shepherd's sales performance exceeded that of each of the other PSMs in the store in late 2002 and early 2003. P. Exh. 33. Shepherd testified that his sales performance continued to exceed that of most people in his district through the end of his employment in September 2003. Tr. 181.

Both store managers and the district manager Shepherd worked under in Macomb — two of whom were adverse witnesses — also testified that Shepherd performed well as a PSM generally and with respect to sales work in particular. Store Manager Terry Wilmot testified that Shepherd's performance as a PSM was "[a]s good or better than most." Tr. 396. Store Manager Steven Thompson testified that "John was a good salesman. He could sell ice cubes to an Eskimo...." Tr. 334-35. Comparing Shepherd's sales performance to that of other employees, Thompson continued: "I had a couple different employees who did well, but John was one of the better ones. [H]is statistics would stand at or above most of them." Tr. 336. Smith likewise testified: "John was a good employee. I mean, that's why I promoted him. He was a hard worker and was good with customers." Tr. 368.

Shepherd testified that with the accommodations he devised for lifting certain items, he was able to perform all functions required of a PSM other than mopping. Tr. 157-58.[4] Accordingly, after concluding that mopping was a marginal function, the jury could reasonably infer from this as well as the above-noted evidence that, with accommodation, Shepherd could perform all of the essential functions of the PSM job — indeed, virtually all of the non-essential functions, as well.

[4] Shepherd also testified that window-washing aggravated his back, but that he was only assigned that task twice. Tr. 155-56. Needless to say, a brief assignment that occurred only twice in the four years that Shepherd was a PSM is not an essential function of the job. Autozone has never contended otherwise.

Indeed, mopping is the only specific function that Autozone's motion identifies as one that Shepherd could not perform. On this point, the defendant contends that the jury was required to credit the testimony of Autozone's 30(b)(6) representative, Karen Miller, who testified by deposition that mopping "is an essential function of any position at AutoZone that is in the store." Tr. 476. That bottom-line statement by its own corporate representative, Autozone contends, compels the conclusion that Shepherd was unqualified for his job, notwithstanding all the other evidence in the record.

It is true that "the employer's judgment as to which functions are essential" is a factor that the jury may consider to determine whether a function is essential. See 29 C.F.R. § 1630.2(n)(3)(i). However, it is not the only factor. See, e.g., DePaoli v. Abbott Laboratories, 140 F.3d 668, 674 (7th Cir. 1998) (a court will "look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions").

There was considerable evidence from which a jury could reasonably conclude that mopping was not an essential function of the PSM job. "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Additionally:

> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:
>
> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

> (3) Evidence of whether a particular function is essential includes, but is not limited to:
>
> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

Id. at § 1630.2(n)(2)-(3).

There was evidence from which the jury could reasonably conclude that mopping was not a fundamental job duty. In light of the evidence that the PSM position was a sales and customer service job and that 80% of the job consisted of that type of work, the jury could reasonably conclude that mopping is not a duty the PSM job was created to perform. Mopping has nothing in particular to do with selling auto parts, and Autozone presented no reason to think otherwise.

Moreover, mopping is neither a specialized task nor one that only a PSM could perform. Autozone stipulated — and its 30(b)(6) designee likewise testified — that a PSM could delegate mopping and buffing tasks to other employees. Tr. 431, 477; see also Trial Stipulations, Doc. No. 227, ¶ 13. Various witnesses testified that there were always at least two people on duty at any given time. E.g., Tr. 148, 406. It was not unreasonable for the jury to conclude that mopping was not essential to the PSM job, given that a PSM could normally opt out of the task entirely by delegating it to other employees.

Finally, the amount of time a PSM typically spent mopping was miniscule — less than

one hour of a typical workweek. Autozone's own 30(b)(6) designee testified that mopping required "30 minutes or less" at the end of the day. Tr. 478. Asked how many times per week any given employee would be assigned to mop, Shepherd testified "two, maybe three at the very most." Tr. 158.

The above-noted items of evidence, alone or in combination, are more than enough to controvert the statement by Autozone's corporate representative that mopping was an essential function.[5] The jury was on solid ground in concluding that mopping was not an essential function of the PSM job.

Autozone also argues the Court is required to infer that Shepherd could not perform the essential functions of the PSM job from the evidence about certain personal care tasks that Shepherd needed assistance with at home. Memorandum in Support, Doc. No. 236-1, at 6. Concerning those personal care tasks and the essential functions of the PSM job, Autozone offers its view that the "movements required are quite similar." Id. These are arguments that Autozone could — and did — present to the jury. The jury rejected them.[6] Autozone's motion essentially asks that the Court "reweigh the evidence," Gower, 377 F.3d at 666, credit Autozone's evidence over the other evidence that conflicts with it, and find in Autozone's favor. That is simply not

---

[5] Moreover, even if Miller's 30(b)(6) testimony on this point had been uncontroverted, as Autozone contends, the jury would not have been required to accept it as true, as it is not testimony from a "disinterested" witness. Tart, 366 F.3d at 472 (crediting "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses"). Miller, who had no personal knowledge about the PSM job as it existed in 2003 — she was hired in 2006 — was testifying solely in her capacity as Autozone's 30(b)(6) designee. If there were ever a witness who is not "disinterested," it would be the designated corporate spokesperson of the defendant whose knowledge of the subject matter was supplied to her by the defendant for purposes of litigation.

[6] It is significant that with the exception of mopping, Autozone has never identified what, exactly, it thinks the essential functions of the PSM job are — much less which of those essential functions Shepherd could not perform. It is simply not plausible that mopping was the only essential function of a sales manager job, and yet that is the picture painted by Autozone's defense in this case. This supplies another basis on which the jury could quite reasonably choose not to credit Autozone's judgment about what constituted an essential function.

the task at hand on a motion for judgment as a matter of law.

Finally, Autozone contends that the EEOC ought to have been collaterally estopped from even litigating Shepherd's qualifications in the first place, since at a previous trial Shepherd was found not to be qualified for the same job at a different period of time, in January 2004. "Federal law determines the preclusive effect of a federal court's decision." Schor v. Abbott Laboratories, 457 F.3d 608, 615 (7th Cir. 2006).[7] Under federal common law, a party seeking to invoke collateral estopped "must show four things: 1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action." Washington Group Intern., Inc. v. Bell, Boyd & Lloyd LLC, 383 F.3d 633, 636 (7th Cir. 2004) (emphasis supplied). Autozone fails to satisfy the first of those elements, as the two trials concerned Shepherd's qualifications at different points in time. Whether Shepherd was qualified in March through September 2003 (when he was working and out-selling his peers) is plainly not the same question as whether Shepherd was qualified in January 2004 (when he was on leave after the career-ending injury he experienced in September 2003). The estoppel argument is without merit.[8]

The evidence presented at trial is adequate to support the jury's conclusion that Shepherd was qualified for his job between March and September 2003.

---

[7] The case cited by Autozone sets forth the standard for collateral estoppel under Illinois state law, although the differences appear to be immaterial for purposes of this motion.

[8] Estoppel may also be inappropriate because the decision Autozone seeks to invoke was an earlier decision in this lawsuit, not a prior suit. To the extent the law of the case doctrine were invoked instead, however, the outcome of Autozone's argument would be the same. See Universal Guar. Life Ins. Co. v. Coughlin, 481 F.3d 458, 462 (7th Cir. 2007) ("Like the collateral estoppel doctrine, law of the case only applies where a court actually decided the issue in question.").

**ii) The EEOC Presented Evidence That Autozone Failed to Provide an Accommodation**

Autozone contends that the EEOC did not present evidence that Autozone failed to accommodate Shepherd's physical limitations. Autozone's argument on this point is simply that there was some evidence in the record — Autozone cites mostly testimony from Thompson — that Autozone did take steps to accommodate Shepherd's disability. That is entirely beside the point, however, since what Autozone seeks to (and needs to) prove is the *absence* of evidence supporting the EEOC's claim, not the presence of evidence supporting Autozone's defense. Tart, 366 F.3d at 472 ("The court must draw all inferences in favor of the nonmoving party.... we must disregard all evidence favorable to the moving party that the jury is not required to believe.").

The EEOC did present evidence that Autozone's managers failed to accommodate Shepherd's disability by requiring him to mop floors, in violation of his medical restrictions. Shepherd and Wilmot testified at length that at Smith's direction Shepherd was required to mop floors multiple times per week for a year or two (including March-September 2003), that Smith directed his store managers to enforce that requirement, and that Smith and Thompson told Shepherd he would lose his job if he did not comply. Tr. 140, 162-63, 173, 175-76, 180-81, 191, 193, 195-96, 411-13, 415. To the extent that Thompson offered testimony that is inconsistent with Shepherd's and Wilmot's, Thompson's testimony must be disregarded for purposes of the instant motion. Tart, 366 F.3d at 472.

Accordingly, the evidence presented at trial supports the jury's finding that Autozone failed to accommodate Shepherd's disability.

**iii) The Evidence Supports An Award of Punitive Damages**

Autozone contends that there was no evidence that its managers acted with the requisite

mental state when refusing to accommodate Shepherd's disability, that is, with knowledge that their actions may have violated federal law. Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999).[9] Under Kolstad, the EEOC must show that Autozone acted "in the face of a perceived risk that its actions ... violate[d] federal law." Id. The Seventh Circuit has held that a "plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws." Bruso v. United Airlines, Inc., 239 F.3d 848, 858 (7th Cir. 2001), citing Roman v. U-Haul Int'l, 233 F.3d 655, 669 (1st Cir. 2000); Ogden v. Wax Works, Inc., 314 F.3d 999,1010 (8th Cir. 2000); Lowrey v. Circuit City Stores, Inc., 206 F.3d 431, 443 (4th Cir. 2000); EEOC v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1246 (10th Cir. 1999); see also Hetrzberg v. Sram Corp., 261 F.3d 651, 662-63 (7th Cir. 2001).

Preliminarily, Autozone has waived the right to contest this point, as it has already stipulated in the Final Pre-Trial Order that Smith, Thompson, and Lead Disability Coordinator Jacqueline Moore received the company's diversity training, including training about the ADA. See May 2, 2001 Stipulation, ¶¶ 31-33, attached as Exh. A to Proposed Pre-Trial Order, Doc. No. 207. There can be no dispute that those employees had the requisite awareness of the law to provide a basis for punitive damaages. Autozone's contention on this point should be rejected on this ground alone.

Moreover, there was ample testimony at trial from Smith, Thompson, and Moore that they were each well aware prior to 2003 that the ADA requires employers to provide reasonable accommodations to employees with disabilities. See, e.g., Tr. 333 (Thompson), Tr. 374-77

[9] Kolstad also requires that the employees responsible for failing to accommodate Shepherd be managerial agents of Autozone acting within the scope of their employment. Id. However, Autozone Autozone did not contest this point, either at trial or in the instant motion. Indeed, among the responsible employees were the district manager and store managers who had direct responsibility for supervising work at the Macomb store.

(Smith); Tr. 312-13 (Moore). For example, when Smith was asked, "At the time you were district manager -- let's focus on the years of 2002 to 2004 -- did you have an understanding that the Americans With Disabilities Act requires that individuals with disabilities be given individualized consideration for reasonable accommodations?" Smith responded "Yes." Tr. 377. In short, the evidence presented at trial makes it clear that this is not a situation in which an unsophisticated defendant was "simply ... unaware of the relevant federal prohibition" or where the theory of discrimination was "novel." Kolstad, 527 U.S. at 536-37.

A plaintiff may also establish the requisite mental state by showing that "defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." Bruso, 239 F.3d at 859-60, citing Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 516 (9th Cir. 2000). As Autozone acknowledged in its opening statement at trial, Smith and Thompson simply denied that they ever told Shepherd that he had to do mopping work. In finding for the EEOC on this point, the jury necessarily concluded that Smith and Thompson lied about their actions.

Accordingly, there was ample evidence in the record for the jury to reasonably conclude that Autozone acted with the requisite mental state to support an award of punitive damages.[10]

Autozone also contends that the jury was required to accept its affirmative defense that "it engaged in good faith efforts to implement an antidiscrimination policy." Bruso, 239 F.3d at

[10] Gile v. United Airlines, 213 F.3d 365 (7th Cir. 2000) is inapposite to this case. In Gile, the defendant did not know that the plaintiff was disabled, see id. at 376, and therefore did not adequately explore what accommodations would have been effective. In the case at bar, by contrast, the jury found that Autozone was aware both of Shepherd's disability and of his need for an accommodation, findings that Autozone does not seek to disturb in the instant motion. The jury in this case could reasonably infer that Autozone was well aware that excusing Shepherd from mopping would effectively accommodate his disability — since Shepherd and his doctor had told the company as much on numerous occasions. Moreover, two store managers had provided Shepherd precisely that accommodation for a while (before Smith put a stop to it), and it was effective. Thus Autozone had first-hand knowledge that what Shepherd had requested would be an effective and reasonable accommodation.

858. There are any number of reasons the jury could reasonably have rejected this defense. First, notwithstanding the repeated statements by Autozone's counsel, no written company policy addressing reasonable accommodation of disabilities was ever introduced into evidence. The jury could reasonably have inferred from this that the company either did not, in fact, have such a policy, or in any event that it was not one that was considered particularly important. Common sense suggests that companies with 65,000 employees tend write down policies that are considered important. Construed in the light most favorable to the EEOC, the lack of a written policy provides adequate reason to doubt Autozone's good faith.

Second, and more fundamentally, to escape liability for punitive damages an employer must not only establish an anti-discrimination policy, but also enforce it. See Cooke v. Stefani Management Services, Inc., 250 F.3d 564, 568 (7th Cir. 2001) ("An employer may escape punitive damages liability for its manager's acts, however, if it can demonstrate a good faith attempt to *establish and enforce* an antidiscrimination policy." (emphasis supplied)); see also Bruso, 239 F.3d at 859 ("[T]he employer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to *implement* an antidiscrimination policy." (emphasis supplied)).

Knowing inaction by upper level management is sufficient to defeat the good faith defense (or at least create a question of fact). In Bruso, the Seventh Circuit concluded that the defendant was not entitled to judgment as a matter of law on the good faith defense where "top management officials disregarded the [company's] policy by refusing to remedy [the] harassment even though they knew about it." Bruso, 239 F.3d at 861.

More generally, the defense may be defeated with evidence that the employer knew about violations and failed to respond adequately and appropriately. "[E]ven if an employer-defendant

adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware." Cadena v. Pacesetter Corp., 224 F.3d 1203, 1210 (10th Cir.2000), cited with approval in Bruso, 239 F.3d at 858 n.7. In another case cited with approval by Bruso, an employer's "sexual harassment policy did not constitute a good faith effort at compliance when the employer minimized the plaintiff's complaints of harassment, conducted a cursory investigation which focused on the plaintiff's performance rather than the harasser's conduct, and forced the plaintiff to resign without imposing any discipline on the harasser." Bruso, 239 F.3d at 858 n.7 (summarizing and citing with approval Ogden v. Wax Works, Inc., 214 F.3d 999, 1010 (8th Cir.2000)).

The good faith defense may also be rejected where an employer has presented no evidence of instances in which its policies were successfully followed and no evidence of a mechanism for periodically reinforcing its employees' understanding of antidiscrimination policies. For example, in Romano v. U-Haul Int'l, which Bruso cited with approval, the First Circuit upheld the jury's finding that the defendant did not put forth sufficient evidence of the active enforcement of Title VII's mandate to shield itself from an award of punitive damages in a sex discrimination case. See 233 F.3d 655, 670 (1st Cir. 2000). U-Haul did distribute its anti-discrimination policies and advised its employees to make hiring and termination decisions without regard to sex. However, the court found that U-Haul "did not put forth evidence of an active mechanism for renewing employees' awareness of the policies through either specific education programs or periodic re-dissemination or revision of their written materials." Id. Further, U-Haul "did not give examples in which their antidiscrimination policies were

successfully followed." Id.

In this case, the evidence (or lack thereof), construed in the light most favorable to the EEOC, falls within each of the above scenarios. Notwithstanding Autozone's assertions to the contrary, there is indeed evidence that a variety of upper level management officials within Autozone's hierarchy were aware that Smith and Thompson were not accommodating Shepherd, but those officials failed to adequately address the situation. See, e.g., Tr. 191-93 (problems reported to a regional HR manager, a loss prevention manager, and to Lead Disability Coordinator Jacqueline Moore), Tr. 358 (Thompson discussed Shepherd reasonable accommodations with Autozone staff attorney), Tr. 489, 493 (Moore received complaints of disability discrimination from Shepherd concerning store manager and others). Although he reviewed a document to refresh his recollection, Shepherd testified unequivocally that he also reported his situation to Vice President of Stores Craig Blackwell in a voicemail, of which he made a contemporaneous record that was introduced into evidence. Tr. 192, 194; see also P. Exh. 4 (handwritten note memorializing voicemail).[11] This evidence is recited at greater length in the EEOC's motion for injunctive relief. See Doc. No. 241, at 2-8. Thus there is evidence in the record from which the jury could reasonably infer that higher level management

[11] Autozone strives to paint Shepherd's testimony on this and certain other points as being unconvincing, and suggests that it should be inferred that Blackwell never learned about Shepherd's situation because Shepherd's testimony and contemporaneous record of his phone message for Blackwell does not prove that Blackwell received it. The first argument goes to the weight of evidence, and the second proposes to draw an inference in favor of Autozone. Neither is permissible on a motion for judgment as a matter of law; the court's task is not to "reweigh" the evidence, but rather to determine whether the evidence could reasonably support the verdict that the jury reached, drawing all inferences in favor of the non-moving party (the EEOC). Tart, 366 F.3d at 472. Autozone offered no testimony from Blackwell or any other evidence to show that Blackwell did not receive Shepherd's message, did not dispute that the phone number written on the handwritten memo (P. Exh. 4) was Blackwell's, and did not attempt to convince the jury of the remarkable proposition that the Vice President of Stores had no capacity to affect what went on at the Macomb store. The jury could quite reasonably infer from Shepherd's testimony and Autozone's failure to rebut it in any way that Blackwell did indeed get the message and simply chose to ignore it.

officials within the company were aware of but failed to adequately address the violation of Shepherd's rights.[12]

Indeed, construing the evidence in the light most favorable to the EEOC, it could reasonably be concluded that Autozone's response to Shepherd's complaints about accommodation of his disability was worse than the response of the employer in Ogden. Beyond listening to Shepherd's concerns over the telephone, e.g., Tr. 193, 489, there is no evidence that Autozone's higher-level managers, HR officials, or Benefits Department personnel conducted even a "cursory" investigation of his complaints (except in response to the eventual EEOC investigation and lawsuit). Although Shepherd was not forced to resign, as was the plaintiff in Ogden, Autozone's response was in many ways even less humane: the company knowingly and repeatedly subjected him to severe physical pain and risk of further injury — risk that did ultimately cause serious injury and the end of his employment.

Moreover, Autozone presented the jury with no evidence about the frequency with which it trains its employees about reasonable accommodation, and no evidence of any instances in which Autozone's purported policy has been effectively enforced.

In short, Autozone presented no evidence of any effort to implement or enforce a policy

[12] Autozone argues that the scenario in Bruso is inapposite because it involves inaction by "top management officials," and the Autozone officials who became aware of the failure to accommodate Shepherd were not "top management officials." Autozone reads too much into that phrase; the managers involved in Bruso were only high level managers *within the company's operations at one airport* (O'Hare). 239 F.3d at 852. One was the "station manager" for United O'Hare, and the other was merely the head of a particular department there ("cabin services"). Id. The department head was the plaintiff's direct supervisor, and the station manager was one level further up in the hierarchy. They were not the top management for the company as a whole, which of course has worldwide operations. Therefore, it is clear that the regional HR manager, headquarters lead disability specialist, vice-president of stores, staff attorney, and others who failed respond adequately to Shepherd's situation are at least as high-level within Autozone's hierarchy as were the individuals in Bruso, when compared with Shepherd's position in the company. As recounted more fully in the EEOC's motion for injunctive relief, many of these officials are the ones from whom the store manager and district manager took direction in matters of reasonable accommodation. Thus the jury could reasonably infer that they occupied positions above the store and district level within in Autozone's hierarchy and in many cases were responsible for addressing precisely the type of violation that Shepherd was experiencing.

of reasonable accommodation in Shepherd's case. Therefore, Autozone has not even met its burden of production on this affirmative defense, and judgment as a matter of law may be denied for that reason alone. Even if the defendant had met that burden, it would still not be entitled to judgment as a matter of law, since there is evidence in the record that permits a reasonable jury to reach a contrary conclusion and find that Autozone did not make a good faith effort to enforce or implement a reasonable accommodation policy.

Acknowledging much of the foregoing law, Autozone nevertheless argues that Bruso should not apply because it was wrongly decided. In its brief, Autozone states:

> The *Bruso* court relied upon *Romano v. U-Haul International*, 233 F.3d 655 (1st Cir. 2000), in support of its expansion of the implementation requirement to include "enforcement" of the policy beyond mere adoption and education. However, the *Romano* court held that a written nondiscrimination policy was insufficient to insulate an employer from punitive damages liability when the employer failed to demonstrate that it had attempted to implement the policy **by educating its employees or actively enforcing its mandate**. *Romano*, 213 F.3d at 670 (emphasis added). The *Romano* court held that the development of an antidiscrimination policy was sufficient to insulate an employer from punitive damages where the employer demonstrates it attempted to implement the policy by "educating its employees or actively enforcing its mandate." The word "or" is disjunctive rather than conjunctive so that an employer could meet its obligation by either developing and educating its employees or developing and enforcing its policies. The *Bruso* court inexplicably dropped the "educating its employees or" language of *Romano* thereby establishing a new and broader scope of liability for employers not supported by Romano.

Defendant's Memo. in Support, at 19 (emphasis in original).

Autozone's argument is premised on a misquotation of Romano. Contrary to Autozone's representation, Romano states: "A defendant must also show that efforts have been made to implement its anti-discrimination policy, through education of its employees *and* active enforcement of its mandate." 233 F.3d at 670 (emphasis supplied). Autozone's quotation of the key part of that sentence replaces the word "and" with "or," and the defendant's argument about disjunctive and conjunctive phrases proceeds from there. Suffice it to say, Autozone's argument

is erroneous. Bruso, Cooke, and other Seventh Circuit cases are not premised upon a misreading of Romano, and in any event they are controlling circuit precedent whose standard Autozone has not met.

For all of the foregoing reasons, Autozone's request for judgment as a matter of law should be denied in its entirety.

**B. The EEOC's Disclosure of Dr. Katchen Is Not A Basis For A New Trial**

Autozone incorrectly claims that a new trial is warranted because EEOC failed to comply with Rule 26(a)(2) regarding Dr. Katchen's expert trial testimony. Autozone is doing nothing more than recycling an argument that has already been rejected by this Court. See Doc. No. 206, p. 25.

Autozone is incorrect that EEOC was required to provide a written report from Dr. Katchen. AutoZone appears to still be confused as to Dr. Katchen's role as an "expert" in this case. Dr. Katchen is an expert under the Rule 702 of the Federal Rules of Evidence because he testified about his treatment of John Shepherd, and his testimony was of scientific and/or technical matters. Dr. Katchen was not, however, an expert that EEOC "retained or specifically employed to provide expert testimony." Fed.R.Civ.P. 26(a)(2)(B). As such, EEOC was not required to produce a written report for Dr. Katchen.

The Federal Rules anticipated situations like this and make clear that treating physicians, like Dr. Katchen, are not required to produce an expert report in order to testify at trial. Rule 26(a)(2)(B) reads:

> Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report — prepared and signed by the witness — if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony.

The Advisory Committee notes for the 1993 amendments to Rule 26 also state: "A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report." Dr. Katchen testified exclusively about his examination and treatment of Shepherd. As such, EEOC was not required to produce an export report from Dr. Katchen.

In addition, the cases cited by AutoZone are distinguishable from the issue at bar. In Meyer v. Nat'l R.R. Passenger Corp., 619 F.3d 729 (7th Cir. 2010), the plaintiff retained his treating physician to provide expert testimony as to the cause of his injuries even though the physician did not make any such determination during the course of the initial treatment. Under these unusual circumstances, the Seventh Circuit held that the treating physician would be required to submit an expert report in accordance with Rule 26(a)(2). Id. at 734-35. That is not the case here. Dr. Katchen merely testified about his treatment, observations and medical diagnoses of John Shepherd at the time of his treatment. This Court has already agreed with this analysis and held Meyer inapplicable in this case. "[Dr. Katchen's] opinions were rendered well before this litigation, and during the course of treatment. They do not fall within the niche carved out by Meyer." Doc. No. 215, p. 7.

Similarly, the Court also previously rejected Autozone challenge of Dr. Katchen's qualifications to render an opinion on depression. The Court stated,

> Dr. Katchen is a neurologist. He was also Shepherd's treating physician. A physician in general practice may offer an opinion relating to his treatment. Katchen prescribed Zoloft, an anti depressant drug at the same time that he was treating him for - indeed, ordering him off work for - his back pain. As a neurologist, he is certainly qualified to testify about the depression for which he treated Shepherd and his opinion with respect to underlying relationship to his back pain.

Id.

AutoZone's reliance upon Musser v. Gentiva Health Servs., 356 F.3d 751 (7th Cir. 2004) is similarly inapposite. In Musser, the plaintiff disclosed all of its witnesses under Rule 26(a)(1)(A), but failed to identify any expert witnesses under Rule 26(a)(2)(A). The Seventh Circuit affirmed the district court's ruling that treating physicians and nurses must be designated as experts under Rule 26(a)(2)(A) if they are providing expert testimony. There is no such debate here, as on November 17, 2008, EEOC identified Dr. Katchen as an expert witness under Rule 26(a)(2)(A). See Plaintiff EEOC's FED.R.CIV.P. 26(e)(1) Supplemental Disclosures, Doc. No. 214, Ex. A.

Lastly, and perhaps most importantly, the parties resolved this very issue over two years ago. In November 2008, after EEOC objected to Autozone's request that it produce an expert report for Dr. Katchen, counsel for AutoZone agreed to EEOC's position, stating, "I agree [Dr. Katchen] doesn't have to produce a report." *See* E-mail from Joseph Spitzzeri to Justin Mulaire dated November 14, 2008, Doc. No. 214, Ex. B. As such, AutoZone's claim that it was somehow prejudiced by the fact that EEOC is did not provide a written report is patently false. Autozone cannot in good faith claim that it was unfairly prejudiced by the fact that EEOC did not produce a report that AutoZone itself agreed that it need not be produced.

## C. An Award Of Backpay Was Appropriately Included In The Judgment

Under the remedial scheme of Title VII, which the ADA shares, "back pay is presumptively appropriate." EEOC v. O & G Spring and Wire Forms Specialty Co., 38 F.3d 872, 880 (7th Cir. 1994), citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 415-21 (1975); 42 U.S.C. § 12117(a) (incorporating Title VII remedies into the ADA); see also EEOC v. Ilona of Hungary, Inc., 108 F.3d 1569, 1579 (7th Cir. 1997) ("strong presumption that [victim of employment discrimination] was entitled to a back pay award on the basis of what she would have earned absent the discrimination").

Questions concerning backpay under the ADA are decided by the Court, not the jury. See Pals v. Schepel Buick, 220 F.3d 495, 500-01 (7th Cir. 2000) ("Back pay and front pay are equitable remedies under § 706(g)(1) [of Title VII, 42 U.S.C. § 2000e-5(g)(1)] and therefore matters for the judge."). However, "[w]hen assessing back pay, ... the judge must respect the findings implied by the jury's verdict...." Pals, 220 F.3d at 501.

Backpay is determined by measuring the difference between Shepherd's "actual earnings for the period and those which [he] would have earned absent the discrimination by defendant." Horn v. Duke Homes, 755 F.2d 599, 606 (7th Cir. 1985). To "discriminate" under the ADA is defined as including a failure to accommodate the known physical limitations of a qualified individual with a disability. See 42 U.S.C. § 12112(b)(5)(A). The jury found that Autozone violated that provision of the ADA by requiring Shepherd to perform mopping assignments between March and September 2003. Therefore, there is a strong presumption that the EEOC is entitled to an award for the backpay that Shepherd lost as a result of Autozone's violation.

The EEOC and Autozone stipulated that in the event that Autozone was found liable for an award of backpay, the amount of such an award would be $115,000. See April 15, 2011 Stipulation, Doc. No. 196, ¶ 2 ("April 15 Stipulation"). Although Autozone retained the right to argue that the EEOC is not entitled to any award of backpay in connection with the reasonable accommodation claim, the parties expressly waived "any and all arguments that the amount of backpay for which Autozone will be liable should be more or less than $115,000." Id. Thus backpay is an all-or-nothing proposition; if any backpay is warranted, the amount awarded must be $115,000.

The stipulation therefore conclusively resolved— and eliminated all burdens of proof with respect to — all questions of fact concerning the amount of earnings lost by Shepherd, mitigating interim earnings, the length of time for which Shepherd's backpay should accrue, and

any other element of the computation of backpay. The only question of fact left unresolved by the April 15 Stipulation is whether Shepherd experienced a loss of wages as a result of Autozone's violation.[13]

However, on May 2, 2011, in the stipulations set forth in the Pre-Trial Order, the parties made further stipulations that resolved the question of causation as well:

> 55) On September 12, 2003, John Shepherd was performing a mopping task at the Macomb store.
>
> 56) While wringing out a mop on September 12, 2003, Shepherd's back condition flared up and he felt a sharp pain in his back.
>
> 57) <u>Because of</u> the flare up of his back condition on September 12, 2003, Shepherd was sent home by AutoZone employees and did not return to work. Dr. Katchen placed Mr. Shepherd on medical leave of absence on September 15, 2003.

May 2, 2001 Stipulation, ¶¶ 55-57, attached as Exh. A to Proposed Pre-Trial Order, Doc. No. 207 (emphasis supplied).

In sum, the jury found that Autozone was responsible for the mopping work that Shepherd was required to perform at the Macomb store in September 2003; Stipulation nos. 55-56 from the Pre-Trial Order establish that Shepherd was injured while mopping on September 12, 2003; and stipulation no. 57 in the Pre-Trial Order establishes that because of this mopping work, Shepherd "was sent home ... and did not return to work." Thus Autozone's failure to accommodate Shepherd caused him to lose wages.

Therefore, in light of the presumptive availability of backpay, the stipulation that resolved all questions as to the amount of backpay, and the Pre-Trial Order stipulations that subsequently resolved the remaining factual question of causation, an award of $115,000 in

[13] Autozone also retained the right to offer any purely legal arguments against the award of backpay, but the EEOC is unaware of any such argument. In any event, Autozone has offered none.

backpay was appropriately included in the judgment.[14]

As noted above, Autozone is correct in saying that it did not waive its right to present an argument about backpay in the April 15 Stipulation. However, Autozone has failed to exercise that right. Pursuant to Fed.R.Civ.P. 50, Autozone had 28 days in which to file post-trial motions. Autozone's motion objects to the inclusion of an award of backpay in the judgment, but offers no substantive argument to rebut the strong presumption in favor of backpay. Accordingly, Autozone should be deemed to have waived any argument with respect to backpay.

Therefore, Autozone's request that the judgment be amended to omit an award of backpay should be denied.

## D. The Jury's Assessment of Compensatory Damages Is Supported by the Record and Remittitur Would Be Inappropriate

Autozone contends that the jury's award of $100,000 in compensatory damages was so extreme that it warrants ordering the EEOC to choose between a reduced amount or conducting a third trial. However, this award is within the range of compensatory awards that have been sustained for employment discrimination cases with roughly similar (or lesser) nonpecuniary harm.

The burden Autozone must bear to show that the jury's award is excessive "is severe." Joan W. v. City of Chicago, 771 F.2d 1020, 1023 (7th Cir. 1985).

> Trial judges may vacate a jury verdict for excessiveness only if it is monstrously excessive or if there is no rational connection between the evidence on damages and the verdict, and appellate review is governed by the extremely limited abuse of discretion standard. Recently, this court added an additional element to the equation where the case under review is but one of a series of similar cases that

---

[14] Even if the above-noted stipulations did not resolve the question of causation, the evidence presented at trial makes leaves no doubt that the leave of absence Shepherd began on September 12, 2003 was as a result of the injury he sustained from his mopping assignment that day. E.g., Tr. 197:9-15. There is no evidence of any other, alternative cause for Shepherd's leave. Id. Therefore, if it were necessary, the Court could make a supplemental finding of fact that Shepherd's loss of wages after September 12, 2003 was caused by Autozone's failure to excuse him from mopping work.

establish a trend in damage awards: comparability.

Id. (internal citations and quotation marks omitted), citing Levka v. City of Chicago, 748 F.2d 421, 425 (7th Cir.1984) ("One factor we must consider in determining whether to set aside an award is whether the award is out of line compared to other awards in similar cases.") "We review the damages evidence in the light most favorable to the jury verdict." Gorlikowski v. Tolbert, 52 F.3d 1439, 1446 (7th Cir. 1995) (internal citations and quotation marks omitted).

Autozone, in many cases improperly construing the evidence in the light most favorable to itself, gives short shrift to the severe and nearly daily physical pain that Shepherd experienced as a result of the company's repeated and ongoing violation of his medical restrictions. Shepherd testified in some detail about the nature of his flare ups and the pain they entailed. Shepherd explained that the repetitive motion required by mopping work caused the muscle tissue in his upper back to swell and become painful and tight, led to redness and profuse sweating, and caused powerful headaches. Tr. 136, 138, 143-44. Shepherd explained, for example: "[T]he continuous, repetitive movement of the pressure of the mop and moving back and forth on my shoulder blade. It causes it to get inflamed noticeably.... I automatically start getting pain, redness in the face and the neck, sweating and a severe headache." Tr. 144. Mopping was typically assigned to any given employee two to three times per week, Tr. 158, and once triggered, the pain and other symptoms of Shepherd's flare-ups could last for hours or days, Tr. 145. Thus the evidence demonstrates a direct causal link between Autozone's violation and the ongoing pain that Shepherd experienced while working at Autozone. According to his wife's testimony, Shepherd experienced flare-ups four or five times per week during the final year that he worked at Autozone. Tr. 306-07.

Indeed, Autozone itself stipulated that: "During the last year that John Shepherd was

working at the Macomb store, he experienced flare-ups of his neck and back impairments multiple times per week during which he would not be able to put on his own pants, his own shoes, brush his hair, brush his teeth, wash his own hair, back or feet, sweep or vacuum around the house, do the laundry, do the dishes, rake leaves, shovel snow, or mow the lawn." Tr. 301; see also Stipulations, Doc. No. 227, ¶¶ 16, 18-19; Tr. 307-09 (Susan Shepherd testimony). The final year of Shepherd's employment included, of course, the six months from March through September 2003 that are within the damages period.

As that stipulation makes clear, the effects of these flare-ups were quite profound, requiring Shepherd to seek the assistance of his wife for basic personal care tasks. When experiencing flare-ups, Shepherd also used electric shock treatments (a "TENS" unit). Tr. 304. According to his wife, that Shepherd was in pain was apparent. Id. Dr. Marc Katchen also gave extensive testimony about the nature of Shepherd's impairments and provided the jury a basis for understanding the nature and severity of the pain that Shepherd experienced when performing activities that aggravated the damages muscle tissue in his back. E.g., Tr. 237-43. Both Dr. Katchen and Terry Wilmot testified that the swelling was severe enough to observe by visual inspection when Shepherd's back when it was aggravated. Tr. 239 (Katchen); Tr. 411 (Wilmot).

In addition to the ongoing physical suffering caused by the flare-ups he experienced four to five days per week, Shepherd also experienced two severe injuries, both prompted by mopping assignments, which resulted in medical leaves of absence. One of these occurred in March 2003, and it took several weeks before Shepherd was released by his doctor to return to work in April 2003. Tr. 177-78, 80; see also P. Exh. 1, 19.

The second and more serious injury Shepherd experienced was, of course, that of September 12, 2003, which began the medical leave that lasted through the end of the year. Tr.

195. Shepherd described the event as follows:

> I was mopping. And what happened was -- is, as I was wringing out the mop, I got a sharp pain in my back, all the way from my upper back through my lower back. And the mop bucket spilled over and poured all over the floor. And I screamed. And Tony Depoy, which was another parts sales manager that was working with me that night, was at the back of the store, and he came running forward.

Tr. 196-97.

Later that evening, when Shepherd attempted the simple task of opening a desk drawer, he experienced "[e]xcruciating pain" and was not able to open the drawer. Tr. 197.

Dr. Katchen testified that he saw Shepherd on an "urgent care" basis in connection with the September 2003 injury. Katchen testified that over the course of the next three and a half months Shepherd required a regimen of physical therapy, as well as pain medication, and sleep medication (to alleviate sleep problems caused by pain). Tr. 256, 258, 259, 263-64. Katchen also testified that during this time Shepherd experienced "tearfulness" in Katchen's office, Tr. 266, and Katchen prescribed him Zoloft, to treat depression, Tr. 265. Katchen noted that these were related to "time off work." Tr. 265.

In sum, the jury heard a great deal of evidence that Shepherd experienced nearly daily pain for six months, punctuated by two serious injuries, the latter of which was severe enough to put Shepherd out of work and necessitate physical therapy and other medical attention for the remaining three-and-a-half months of the year. The jury could conclude without difficulty that the totality of Shepherd's physical pain and suffering over the last nine months of 2003 was tremendous. Moreover, especially after also considering the emotional distress — tearfulness, depression — that was evidenced by Dr. Katchen's testimony and other medical evidence, the jury's award of $100,000 is not lacking in a rational connection to the evidence. Even if reasonable minds could differ as to the precise amount that adequately compensates for

Shepherd's ordeal, the award the jury settled upon after considering the evidence is not "monstrously excessive."

Alternatively, Autozone attempts to demonstrate — by citing just two cases — that the jury's award is not comparable to awards in similar cases. First of all, "even though [a]wards in other cases provide a reference point that assists the court in assessing reasonableness[,] they do not establish a range beyond which awards are necessarily excessive." Deloughery v. City of Chicago, 422 F.3d 611, 621 (7th Cir. 2005). "Due to the highly fact-specific nature of Title VII cases, such comparisons are rarely dispositive." Id. The Seventh Circuit has sustained substantially higher compensatory damages awards in those cases where the harm for which the plaintiff seeks compensation "included a physical element." See Thompson v. Memorial Hosp. of Carbondale, 625 F.3d 394, 410 (7th Cir. 2010).

Autozone falls well short of meeting its burden, as the two cases it cites are not comparable to this case. In Avitia v. Metropolitan Club of Chicago, Inc., a FLSA retaliatory discharge claim, an award of $21,000 in compensatory damages was remitted to $10,500. See 49 F.3d 1219 (7th Cir. 1995). However, the case involved "no evidence" of physical pain or distress. Id. at 1226. The plaintiff presented evidence of emotional distress only, consisting of his own terse statement that he cried after losing his job and was upset by the experience. Id. Three months after this "moment's pang of distress," he had found new and comparable employment. Id. at 1229. In no respect does this resemble Shepherd's experience, which consisted of severe physical pain experienced nearly daily over a period of nine months, as well as two serious injuries. In addition, Shepherd experienced emotional distress that was more severe and supported by medical evidence. Shepherd, of course, had not obtained any employment, much less comparable employment, within three months. The cases are not

comparable.[15]

The other case cited by Autozone is also a retaliatory discharge case that presented evidence of emotional distress only. See Merriweather v. Family Dollar Stores of Indiana, Inc., 103 F.3d 576 (7th Cir.1996). It presented no evidence of physical pain or injury, and for that reason alone is not comparable to the case at bar. Furthermore, in Merriweather, in which an award of compensatory damages for a short-term, part-time employee was remitted from $25,000 to $18,750, the Seventh Circuit explained that apart from the defendant's retaliation, there were "[o]ther factors relating to her emotional distress during this tumultuous period in her life, but unrelated to Family Dollar, includ[ing] the death of Merriweather's father, being evicted from her apartment, and being unable to find a suitable job." Id. at 581. Indeed, the plaintiff "testified that her belief that she had been discriminated against, given negative recommendations which kept her from getting work elsewhere, and harassed by Family Dollar *added to* her anger and distress." Id. (empasis supplied). Shepherd's problems in 2003, by contrast, were primarily due to Autozone. Autozone caused the pain that consumed Shepherd's days and nights, and Autozone caused Shepherd's injuries. Notwithstanding the argument of Autozone's counsel in the instant motion, the defendant presented the jury with no evidence whatsoever that Shepherd's flare-ups were caused by some other force.[16]

Autozone attributes to Dr. Katchen the studiously vague statement that Shepherd was

---

[15] One point that Avitia helpfully clarifies is that "[i]n a statutory tort case as in a common law tort case, the 'eggshell skull' rule prevails, so it is no defense to an award of full damages that the plaintiff's injury was amplified by a preexisting condition for which the defendant was not responsible." Id. at 1228. Thus to the extent Autozone's violation of the law had more profound consequences for Shepherd because of his medical and personal circumstances, it is entirely appropriate for the compensatory damages award reflect the full extent of the damages Autozone caused.

[16] It may be true that even if fully accommodated at work, Shepherd might occasionally experience a flare-up from other activities. However, Autozone has made no attempt to present evidence on this point, much less quantify this. The defendant, having failed to made any effort to present evidence on this point to the jury, should not be permitted to simply conjecture about other, unexplored sources of physical or emotional pain.

experiencing "the same problems at home in 2003 that he was having in 1998 as he would yell at his children due to his situation." Defendant's Memo. in Support, at 34. However, Katchen testified that Shepherd was experiencing only "some" of the same problems, and did not indicate which ones. Tr. 283. This hazy tidbit of testimony in no way makes Shepherd's situation in 2003 comparable to that of the plaintiff in Merriweather.[17] It is may be easy to caricature Shepherd as a person who simply has problems in life, but a careful look at the matters admitted into evidence makes clear that in 2003, Shepherd's main problem was Autozone.

Although Autozone has not met its burden to justify remittitur of compensatory damages, the EEOC notes that there are any number of employment discrimination cases that demonstrate that the range of permissible compensatory damages awards may extend well into the six figure range when the harms involved are severe, and in particular when there is an issue of physical harm or risk involved or where there is medical evidence of severe emotional distress.

• Thompson: In this case, a paramedic was placed on probation because of his race, and a jury awarded $500,000 in compensatory damages. The Seventh Circuit remitted this to $250,000, noting that plaintiff had testified that because of discriminatory treatment, "he was concerned for his safety and that of his patients," and had also presented evidence of depression and anxiety.

• Farfaras v. Citizens Bank and Trust of Chicago, 433 F.3d 558, 566 (7th Cir. 2006) (affirming $200,000 award — $100,000 for pain and suffering, and $100,000 for loss of dignity, humiliation, and emotional distress — upheld, even though "there was no extensive

[17] Either way, though, the testimony proves nothing of use to Autozone; 1998 and 2003 were both times when Shepherd had recently experienced difficulty maintaining employment, and so it would not be surprising if he experienced emotional distress during both periods of his life. To determine the impact of Autozone's conduct on Shepherd's life, however, the more natural comparison would be to those far more comparable periods of time when Shepherd was working for Autozone and was temporarily provided an accommodation by his store managers in 1999 and 2001-02. There is no evidence in the record to suggest that Shepherd experienced alternative stressors during those periods of time.

psychological or medical testimony presented in this case")

• Deloughery v. City of Chicago, 422 F.3d 611, 619-21 (7th Cir.2005) (retaliatory failure to promote, affirming $175,000 award for emotional distress)

• Naeem v. McKesson Drug Co., 444 F.3d 593, 612 (7th Cir. 2006) (sex discrimination and intentional infliction of emotional distress, affirming $240,000 award for emotional distress)

• Harvey v. Office of Banks & Real Estate, 377 F.3d 698, 714 (7th Cir.2004) ("jury could have reasonably concluded that awards in the range of $50,000 to $150,000 were necessary to compensate" plaintiffs in a discrimination case where evidence showed that they suffered from "continuing mental and physical ailments arising from ... problems at work").

• Lampley v. Onyx Acceptance Corp., 340 F.3d 478, 484 (7th Cir. 2003) (race promotion and retaliatory discharge case, which $75,000 award for emotional pain and suffering would be appropriate, even though plaintiff found a new job within two months, since some emotional effects continued to linger)

• Cosby v. Autozone, 2010 WL 5232992 (E.D.Cal. 2010) (attached as Exh. C to the EEOC's motion for injunctive relief) ($1.3 million in "mental suffering" damages for failure to provide a reasonable accommodation to an employee)

The EEOC also respectfully refers the Court to O'Sullivan v. City of Chicago, a failure to promote case that approved a $250,000 compensatory damages award in a failure-to-promote case and which contains citations to other six-figure compensatory damages awards. See 474 F.Supp.2d 971, 988-89 (N.D.Ill. 2007) (no medical expert or records presented).

In light of the foregoing analysis and examples of other employment cases involving six figure compensatory damages awards, the jury's compensatory damages award of $100,000 to Shepherd is not excessive, is grounded in the evidence, and is within the broad range of

compensatory damages awards acceptable in cases involving severe physical and/or emotional pain and suffering. Accordingly, remittitur of the compensatory damages award is not warranted.

## E. Remittitur of Punitive Damages Would Be Inappropriate Except To The Extent Required By The Statutory Damages Cap

As Autozone notes, the typical approach to bringing a damages verdict within the statutory limit prescribed by 42 U.S.C. § 1981a(b)(3)(D) — in this case, $300,000 — is to make the necessary reduction from the punitive damages award rather than making a pro-rata reduction to both compensatory and punitive damages. See Lust v. Sealy, Inc., 383 F.3d 580, 589 (7th Cir. 2004) (collecting cases). The EEOC agrees. The Seventh Circuit has further commented that "the sensible thing for the judge to do is not to make a pro rata reduction, ... but instead to determine the maximum reasonable award of compensatory damages, subtract that from $300,000, and denote the difference punitive damages." Id. As the compensatory damages award is not excessive, the EEOC respectfully requests that it be left undisturbed and that the judgment be amended to reduce the punitive damages award from $500,000 to $200,000. The resulting total of compensatory and punitive damages will comply with 42 U.S.C. § 1981a(b)(3)(D).

The jury plainly agreed that Autozone was not only in violation of the ADA, but knowingly so — and that a strong deterrent would be needed to make clear to the company that its conduct in this case must not be repeated. The jury's conclusion is supported easily by the evidence presented at trial.

The Seventh Circuit "has enunciated three guideposts to steer the evaluation of whether a punitive damage award is grossly excessive such that it offends due process: (1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm or potential harm

suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." Farfaras, 433 F.3d at 567. Autozone's discussion of multipliers, to the extent it is motivated by due process concerns, is misplaced. See Lust, 383 F.3d at 590 ("When Congress sets a limit, and a low one, on the total amount of damages that may be awarded, the ratio of punitive to compensatory damages in a particular award ceases to be an issue of constitutional dignity").

Autozone identifies five factors to be considered in evaluating reprehensibility: (1) whether the harm done was physical as opposed to economic; (2) whether the conduct involved indifference to the health or safety of others; (3) whether the victim was financially vulnerable; (4) whether the conduct involved repeated actions or was isolated; and (5) whether the harm suffered by the plaintiff resulted from conduct that was known or suspected to be unlawful. All of these factors favor leaving the jury's verdict undisturbed. As discussed extensively above, the harm done to Shepherd was in large part physical, and it squarely implicated Shepherd's health and safety. If repeated, Autozone's conduct would presumably affect the health and safety of other employees, as well. Shepherd, who testified that he needed to keep his job in order to support his family, was very much financially vulnerable. Autozone's conduct was repeated multiple times per week over a period of many months; this is not a case involving an isolated episode of improperly assigned work. Finally, as discussed above and in the EEOC's motion for injunctive relief, the jury concluded that Autozone's managerial agents knew or suspected that the company's treatment of Shepherd was a violation of federal law. Autozone offers no contrary analysis of these factors. They all strongly support a substantial award of punitive damages.

The other two guideposts established by the Seventh Circuit likewise provide no basis for

disturbing the punitive damages award, as modified by the statutory cap. For the reasons set forth above, Shepherd's backpay and compensatory damages recovery in this action total $215,000. Therefore award of punitive damages represents less than half of the total verdict and there is little disparity between punitive damages and the harm suffered by Shepherd.

Autozone's citation to various cases on this point is misplaced. Gile and Shott v. Rush-Presbyterian-St. Luke's Med. Ctr. are cases in which the courts determined that the plaintiff had not met the threshold standard for *any* award of punitive damages; the decisions shed no light on what the appropriate *amount* of punitive damages might have been had the defendants acted with the requisite mental state. The other two cases Autozone cites in fact lend support to the jury's verdict, rather than undermining it. The resemblance to Lampley, in particular, is striking. As discussed more fully above, the jury in this case was presented with evidence that a number of people in Autozone's upper management were aware of Shepherd's complaint that his disability was not being accommodated. Their response was to disregard his complaint (and his federally protected rights), even when it became clear that the company's failure to accommodate him was subjecting him to harm. It is somewhat breathtaking that Autozone, having denied everything and declared Shepherd to be a liar in two separate trials, now suggests that the company and its managers have *not* "tried to discredit Shepherd rather than admit the facts." Defendant's Memo. in Opp. at 40. That is in fact precisely what Autozone has done, and the jury is entitled to take note of that in assessing the amount of punitive damages. Likewise, it is unclear how Autozone can seriously contend that Shepherd has not suffered severe emotional and financial hardship. Autozone is well aware that Shepherd has not been able to find work and lives on a meager Social Security benefit — and in any event Autozone itself stipulated that he would be entitled to recovery of $115,000 in lost wages, albeit wages that Autozone does not consider itself liable

for. Suffice it to say, Autozone's attempt to distinguish this case from EEOC v. AIC Security Investigations is without merit.

If the jury's reasonably-supported findings are accepted as true, as they must be for purposes of this motion, the fact of the matter is that Autozone refused to provide a remarkably modest accommodation to a sales manager in 2003, despite knowing that he was disabled, knowing that he needed the accommodation, and knowing that he was entitled to it under federal law. Shepherd contacted a variety of people at all different levels of the company in an attempt to resolve this matter. His pleas were ignored and as a direct result he experienced tremendous pain and was seriously injured. The defendant has devoted eight years to falsely denying that any of this ever happened. It is possible that other finders of fact might weigh the evidence in this case differently and reach different conclusions, but given this factual background, the jury in this case was well within its discretion to conclude that Autozone's conduct in this matter has been truly reprehensible. Therefore, the jury's determination that a substantial penalty is needed to deter the company from repeating the conduct in the future is entitled to respect.

If there were any risk that the jury's original punitive damages award were nevertheless excessive, such risk will be eliminated by the reduction of that award by 60% to conform to the statutory cap. If anything, there is more likely a risk that a cap designed for companies with 501 employees will have too little deterrent effect on a company of Autozone's size and wealth.

The evidence presented at trial provides an adequate evidentiary basis for the jury's award of punitive damages, as modified to conform to the statutory cap. Autozone's request that the EEOC be directed to choose between a third trial and remittitur to a lower amount should be denied.

## CONCLUSION

For the foregoing reasons, the verdict of the jury is reasonably supported by the evidence and should not be disturbed, except that the judgment should be amended to reduce the award of punitive damages from $500,000 to $200,000 to conform to the statutory damages cap. The EEOC respectfully requests that Autozone's motion be denied in all other respects.

July 29, 2011

Respectfully submitted,

s/ Aaron R. DeCamp
Trial Attorney
Equal Employment Opportunity Commission
500 W. Madison St., Ste. 2000
Chicago, IL 60661
312-869-8106

Justin Mulaire
Trial Attorney
U.S. Equal Employment Opportunity Commission
131 M St. NE
Washington, DC 20507
202-663-4741
bar ID number: 4311031

**Certificate of Service**

I hereby certify that on today's date, I caused a copy of the Plaintiff U.S. Equal Employment Opportunity Commission's **MEMORANDUM IN OPPOSITION TO AUTOZONE'S MOTION FOR JUDGMENT AS A MATTER OF LAW, FOR NEW TRIAL, OR IN THE ALTERNATIVE, TO ALTER OR AMEND JUDGMENT** to be served upon counsel to Defendant Autozone, Inc., via the court's Electronic Case Filing system, pursuant to this court's Local Rule 5.3.

July 29, 2011

Respectfully submitted,

s/ Aaron R. DeCamp

Aaron R. DeCamp
Trial Attorney
U.S. Equal Employment Opportunity Commission
500 W. Madison St., Ste. 2000
Chicago, IL 60661
312-869-8106